The final case for argument this morning is 14-1350, Kennametal v. Ingersoll Good morning, Your Honor. May it please the Court. The Patent Trial and Appeal Board made a legal error in the pending Inter Partes Reexamination Appeal when it adopted a new round of projection under Section 102 based on the GRAB patent. The GRAB patent does not disclose the essence of the 519 patent, which is the use of a ruthenium-featured binder with a direct PVD coating on the substrate. Rather, the GRAB patent presents a classic catalog of different parts and elements that the Patent Trial and Appeal Board erroneously combine together to find anticipation. In particular, all of the examples in the GRAB patent relate to CVD coatings, not PVD coatings. And, in fact, the only discussion in GRAB of PVD is that it might be contemplated one day as a coating to be used. But isn't that a disclosure of that as a possible coating? Your Honor, GRAB certainly does mention PVD as a possible coating, but what GRAB does not do is reference the well-known problem in the art of combining a PVD coating on a substrate with a ruthenium-featured binder, which was well known to create enhanced cobalt capping effects that led those of skill in the art away from such a combination. There is no disclosure in GRAB of that problem or of any solution to it. And so the mere generic reference in GRAB of PVD as a known coating, which, again, the 519 patent admits that PVD is a known coating. But even if it didn't work, is it not a disclosure? Is it not prior art? Well, Your Honor, we acknowledge that PVD coatings were in the prior art. The 519 patent admits that. But the question is, is there... But in this combination, you have a dependent claim, Claim 5, that talks about the binder can include one or more elements, one of which is ruthenium. And then in Column 4, the place you referred us to, it talks about coatings. And there are three different ways that you could coat. What more do you need? Your Honor, you need a specific disclosure, something that would leave one of skill in the art to recognize that combination. When you have a patent like GRAB that is a catalog of many different elements, there are many different things in GRAB, many different binder components, many different coating types. And as we illustrated in our brief, it's not just a matter of thinking three coatings times five binder elements in Claim 5 of GRAB. It's a matter that you might combine one or more of these components in the binder. You might use one or more coating elements. And as I think we illustrated in our brief, there could be anywhere from 100 to over 10,000 different embodiments based on that. Well, except that they disclose, the specification discloses three methods to apply it. And one of those methods is the PVD, right? Your Honor, there is a bare reference to PVD. We would respectfully disagree that there is a That was a known problem in the art. It was known to cause enhanced cobalt capping. And there's a stray reference in GRAB to a contemplation of PVD. When you take that against the undisputed background in the art, that use of a thin coating like PVD with a substance like ruthenium that caused enhanced cobalt capping problems, it was known that that did not work. And so GRAB simply is silent on all of these problems that were known in the art and that 519 patent tried to solve. But again, is there any requirement in our law that a prior art reference actually work? If there's a disclosure, there's a disclosure. If it has the right date, if it's disclosed in a patent or a printed publication more than a year before the filing date, that's a proper 102B reference, even if the prior art didn't work. Well, this Court has dealt with this issue many times, largely in the pharmaceutical context. But these patents where we have these laundry lists or catalogs of elements, and the problem is it's not enough to just list a whole bunch of things you can do over here and then a whole bunch of things you can do over there and then say, well, there's disclosure of every which way you might combine them together. I know there's some reference to the Petering case and to the Wrigley case, and I'm not sure this is the same kind of case. Those cases involve drugs, for example, where there are literally hundreds, sometimes thousands of possible combinations. And it's well known in those arts that slight changes, modifications make all the difference in the world. This is a little different animal, isn't it? Well, I respectfully disagree, Your Honor. I think it is the same animal. It may not be pharmaceuticals, but this art is every bit as unpredictable as the pharmaceutical art. The inorganic chemical arts are just as unpredictable. But even with respect to the other coatings, isn't there some disclosure in that Grab reference that you machine it or you polish it or you somehow treat it before it's coated? There is, Your Honor, with respect to the specific CVD coating examples. But again, CVD coating is much thicker. You don't have to do as much to massage the CVD coating. CVD is much thinner, so you run into problems where you have these cobalt caps that will tend to make the surface uneven. You get voids, and that's what was unrebutted testimony at A353 in Dr. Morton's declaration, for example, that you have these problem of voids that come into the substrate when you have a thin coating. And so the fact that there's disclosure in CVD examples in Grab of specific machining steps doesn't really apply to PVD. In fact, it was well known that some of those same machining steps weren't as easily applied to PVD, particularly when you have ruthenium, which is well known to enhance these cobalt caps on the product. And I'd like to reference two other areas where even Ingersoll's expert admits that this is a highly unpredictable field. At record page A1111, Ingersoll's expert, Dr. Brook, admits that there are an infinite number of possibilities for coated cutting tools. And at A1104, he has a lengthy discussion on that page and continuing for several pages of the large number of variables that can affect cutting performance. So this is not, pun intended, this is not a cookie cutter technology area. This is an area where these very subtle differences in coating thickness, temperature, the type of machining that's done, the type of substrate and binder that are used can have profound effects on not only the cutting performance, but whether the tool will stick together in the first place. And that was a problem with the prior art as it applied to ruthenium featured binders and thin PVD coatings. That was the problem known in the art. And there's really been no refutation of the existence of that problem. Ingersoll has not come in with any evidence that people had known, have dealt with it and solved the problem. And that's what the 519 patent contributed, is a solution to that problem. We do think that with respect to the petering test, and we think that the board erred by applying the petering test, because it telescoped and number of choices too much to get down to 15. As we showed in our brief, it's not a matter of 15, it's 100 or 10,000 or more, depending on how many coatings you might use, what order you put them in, how many binder elements, what concentrations. And more fundamentally than that, the petering case and the subsequent line of cases relate to a situation where the total circumstances matter. In petering, we had a very specific circumscribed chemical formula, and there weren't simply many options for the different radicals. There weren't many places they could go. So there was a very limited class. The key is, with one skill in the art, reading the prior art, immediately envisage each and every possibility. And that was what was found to be true in petering, but we would respectfully suggest it's not true here in graph, given the background in the art of knowledge of defects that ruthenium featured binders can cause. There's no question that that was a problem, and there's a very specific solution to it shown in the 519 document. What of any deference do we give to the Patent Office in this regard? Well, Your Honor, with respect to the 102 rejection in the application of petering, we would respectfully suggest that it is a legal question, and that it was legal error to apply that. To be sure, any subsidiary factual questions do involve a clear error review standard. But here the Board did something a bit unusual in that the examiner refused to adopt the 102 rejection. The Board then adopted a 102 rejection on the same record as the examiner. We feel like that's a legal error that this Court should review de novo in regards to the application of Section 102. I do want to mention a little bit about the Section 103 rejections as well, unless the Court has any additional questions on the 102. The other side of this appeal is the 103 rejections. In that case, we believe that it was a legal error as well that is subject to de novo review for two reasons. First, there was a procedural error, and second, there was a substantive error. The procedural error comes from the way that the Board dealt with the claims. As I mentioned, the examiner gave 103 rejections throughout. The Board took the independent claims 115, 83 in particular, and adopted a new ground of 102 rejection. But in doing that, the Board failed to use the same reference for the dependent claims that it used for the independent claims. In other words, it said the independents were anticipated by Grab, but then for all the dependents, it used other completely unrelated references to say they were obvious. So we have a case where the base claim, we have reference A, and then the dependent claims, we have references B, C, D, etc. But there was no finding that all of those references put together would render any of the claims obvious. So we believe that's a legal error in that essentially, and we've gone through this in our brief, and it gets complex with the number of combinations and rejections. Are you saying there was an error in the way these references were combined by the Court, or that the Court erred in combining them at all? Well, Your Honor, both. On the procedural point, it's the second statement, that it erred in combining them because it used references unrelated to the 102 reference to find dependent claims obvious without... That sounds to me like a novel theory of obviousness. Does your appeal turn on that principle? It does not, because even if the board were found to have acted properly procedurally, there's also a substantive error that I mentioned, and that is that all of the prior art references that the board used for these dependent claim obviousness rejections really are nothing more than what the 519 patent admitted was known in the prior art. What the board did, and the board adopted the examiner's reasoning, but what the examiner did was take a number of references where you say reference A teaches PVD coding, reference B teaches that you can have a ruthenium-featured binder in an uncoated cutting tool, for example. It would have been obvious to put them together. There's no acknowledgement or discussion in any of those references or in the examiner's findings of this problem of cobalt capping that led those of skill in the art away from such a combination. It's very conclusory in its analysis, and it in effect combines disparate references with no tie or suggestion. There's been no rational articulation or underpinning to show why one of skill in the art would have been motivated to combine those. As my friend on the other side argued below at the board hearing, they took an ice cream bar approach where you say we've got all these ingredients, let's just put them all on our sundae and we'll combine them all together. And that may be fine at an ice cream bar, but that's not the law for obviousness. There's got to be some rational articulation of why we're going to use a PVD coating with a ruthenium-featured binder. Why don't we hear from the other side? Thank you, Your Honor. May it please the Court, Nanda Allapatti for Appelli Ingersoll Cutting Tools. We think this is a very simple case. The question is whether or not the board erred in deciding that Graff anticipates Claim 1 and Claim 1 only. They talk about dependent claims. That's not an issue, and here's why. When they appeal to the board below, they said all claims stand or fall together on Claim 1. The board was not obligated to issue individual decisions as to what claim is rejected under what item, but that's what boards do. They have to explain why every claim is rejected. So they said these claims are anticipated, including Claim 1 and all the other independent claims, or four to five independent claims. And with the dependent claims, they basically accepted what the examiner had found below, adopting wholesale large portions of the right of notice appeal. So only Claim 1 is at issue. Thank you. But in fairness, don't you think they were saying, well, for purposes of the, or with respect to the rejections at hand, Claim 1 is the only claim at issue, and all of the rest of the claims will tag along? Right. Well, when the rejection changed, don't you think they should have a right to say, well, maybe all the claims are not, should not be considered the same way under the different ground of rejection? If you look at what the board did and what the board was asked to do, the board was asked, did the examiner err in refusing Ingersoll's 102 rejection? And Kennemann asked, did the examiner err in accepting the 103 rejections? What the board answered was, is Claim 1 invalid? And that's an unfortunate thing. Below, the board should have decided the 103 issue posed by Kennemann. That's what they should have done. And if you reverse on the 102, what you'll have to do is go back to the board and say, do a 103 analysis. And then we'll be here in two years arguing the same prior art, pretty much as it is. So, one of the reasons why it's a simple case is because the invention is so simple. What the inventors did with the 519 patent is take a pre-existing, off-the-shelf, uncoated ruthenium-containing insert, and they coated it with PVD. That's all they did. In example 2 of the 519 patent, what they say is they take this substrate, they blast it, and coat it with PVD. Blasting itself is a prior art technique. I don't know what the big problem with cobalt capping was, and here's why. Two and a half years earlier in Japan, the Hitachi Metals Company filed a patent application. That patent application is in the record at A576. Examples 8 and 9 of that patent indicate that Hitachi Metals was able to coat with PVD a ruthenium-containing insert and test it. I don't know if they thought there were surprising results or anything like that, but what that shows is that the level of skill in the art about two years and four months before the filing date of the 519 patent was that someone else seemed to have obviously solved the cobalt capping problem and made the PVD stick to the ruthenium-containing insert. Now, the fact of the matter is that Japanese reference is not eligible as prior art because they swore behind it during the prosecution of the 519 patent. It published 10 months earlier than their filing date, not 12 months earlier. But it shows the level of skill in the art at that time. Cobalt capping was not a problem. Now, they claim it's a big problem, but our experts say that, look, cobalt capping is a problem that's known and one way or another you can probably take care of it if you work diligently. That's the fact of the matter. Now, although back then the Hitachi Metals patent is not prior art and usable, the Grab reference is. And to appreciate what the board did to see whether there's clear error, I suggest you turn to page A2056, which is in the decision. What they do on that page is they lay out two findings of fact, finding of fact five and finding of fact six. Finding of fact five basically says there's CVD, PVD, and MTCVD as the three basic techniques you could use. Finding of fact six on page A2056 juxtaposes claim one and claim five of the Grab patent. If you think of claim five as a dependent claim, which basically incorporates all of claim one, think in your mind of what the board is looking at. They are looking at a claim that says a coded tool, it's got substrate, and it could have in the binder, among other things, ruthenium. Now, that to me is something that lets one automatically envisage all the members of the class that are relevant of the claimed composition. Simple as that. It is laid out in a form and there is no problem with sericent. It's laid out exactly in the specification. Now, Ketametal says two things. There are tens of thousands and there's this one or more and all this stuff. Well, look. The language one or more is no stranger to this court. We heard this morning in Enzo Via Plara. One or more is patentees, okay? Patent attorneys use it. When you look at one or more, you know there can be one or more. You don't think thousands. If I see one or more in a claim and I'm doing an infringement analysis, I need to only find one. If I'm doing an validity analysis and it's one or more, I need to only find one of those in the list. One or more just can mean one and that's what you think of. That's what you envision. More importantly, they talk about PVD, CVD, and empty CVD, and they also say in their brief that the coding in the examples of three layers, and you have three different possibilities. There are nine or 27 in just the coding itself as possibilities. Then they can take different combinations of the five and so on. No one really thinks that way, and even Grab doesn't think that way, and for that, I direct your attention to the Grab patent at A63, column four, line 35 to 41. In that passage, Grab describes the coding that he shows in figures one and two, and when he shows figures one and two, there is a coding. I believe it's reference numeral 29, and Grab at that passage says that there's a base layer, immediate layer, and an outer layer, and he then says in the last sentence of that paragraph, although this specific embodiment illustrates three layers, applicants contemplate that the coding scheme may comprise one or more layers. So when you see the word coding in claim one, that could be one layer, and that one layer could be PVD, and there's only three possibilities for that, not tens of thousands. When you look at claim five, you see the five items, ruthenium, rhenium, and so forth. You're looking at the page. It jumps out at you that ruthenium is already there. You don't have to imagine and envisage something that is a species of a large genus. It's very clear. It's laid out just as it's called for in petering. You're talking about obviousness, right, rather than anticipation? No, I'm talking about anticipation. Well, anticipation requires a specific statement of exactly what's being claimed. I would think your argument would be more pertinent to obviousness. I think it applies to both. The in re-petering analysis is, can you envisage the claimed invention? In fact, in your dissent in the Wrigley case, what you said was that... Dissents are not the law. Okay. In that case, anyway, because I expect them to quote you because it was a dissent in Wrigley, which I think also applies, you said that all you have to do is be able to envisage the claimed composition. Can you envisage, by looking at that claim and the whole reference as a whole, the three possibilities for the coding and the five possibilities in the binder, can you envisage that there is a PBD coding on a ruthenium tool? I think the answer is yes, and I think there was no clear error at the lower court, sorry, at the board, in concluding that there is anticipation under petering. Now, if you don't like petering and you think that that may have been clear error, I believe the Wrigley case gives you another opportunity to look at this situation from a different view. Now, petering and its progeny are based in the context of genus and species and chemical stuff and so forth. They claim, and they say, and I don't really dispute it one way or another that much, that in the cutting tool industry, in the cutting tool arts, a certain kind of coding layer makes a big difference. A certain type of shape of the cutting insert makes a big difference. We agree with all that, but here's what happened in Wrigley and here's why we cited Wrigley to the board. The claim structure in Wrigley and the claim structure of the chemometal claim one are fairly similar, in the sense that their structure is similar. In Wrigley, claim 34, which was found anticipated by the Shahidi reference, is directed to a gum composition or a chewing gum composition. It has generic chewing gum parts, such as it's got a substrate, a base, it's got some sweetening agents, and the novelty is the combination of a cooling agent called W23 and menthol as a flavoring agent. That was the claim in Wrigley. The claim here is a cutting tool that has generic cutting tool parts, substrate, a binder, hard particles, and the hook of the novelty is the combination of ruthenium and PVD. So you have a similarity in structure overall. Then you look at the prior art in Wrigley and you look at the prior art in Grapp. The prior art in Wrigley was the Shahidi reference. It's got a among a list of 23 ingredients, and it's got the W23 and two other preferred compositions, which were drawn from a large string of compositions that are possible. Here in the case of Grapp, we've got a coating, which is one of three types, PVD, CBD, and anti-CBD, and you only need one layer according to Grapp's disclosure. We also have these five items, a small list, five instead of say 23 in the case of the Shahidi patent, three instead of the case of three preferred components in the Shahidi prior art. Was there evidence that any of these deposition processes could be used to equal effect and with the same result? How? That's a very good question. It's a very complicated question, and let me try to answer it in this way. It makes a difference. What I'm trying to get at is whether there was, in fact, a superior result using this method, or whether you are telling us that since this was listed as a possibility, that's enough, whether or not it's better than the others. That's a little complicated. Well, it is. The reasons are in the examiner's rad and in the record below. It's very complicated because of this reason. Some things are naturally cut better with PVD than with CBD. Some things are cut better with certain kinds of coatings than other kinds of coatings. It depends on the machine you're cutting, the workpiece you're cutting, how fast you need to cut, the shape of the cutting insert edges that are involved. There are many, many complicated factors. So, you can find some device to cut under some conditions where that PVD coated with phenium insert is better. I can find other things to cut with that same insert where it doesn't work as well. So, it's a very complicated question. All of that is discussed below in the board explains why they did not put much weight on the unexpected results supposedly claimed by Panama. So, in conclusion, we feel that on 102, the board did not commit clear error, whether you use the Petering reasoning or use the Wrigley reasoning. In Wrigley, in your dissent, which I appreciate, there were two items you said. One is that the Shahidi reference could be used to make many different things. You could make dentatures, which I'm not even sure what that is. You could make other things with it also. Whereas, all you're looking at in Wrigley is a chewing gum composition. Well, here, that issue is not there. Grab teaches making a cutting tool, a cutting insert, and that's what the claim 1 of the 519 patent is about. The second thing you noted is there's a number of items from which the three flavoring agents of which W23 is a part of, where they come from. There's a vast number. We don't have that problem that you've cited in Wrigley. We have three coatings. We have five possible binder ingredients. And for that reason, we think that the 102 rejection is correct. If you disagree, remand to the board and they'll have to do a 103 analysis. Thank you. Mr. Moore. Thank you, Your Honor. Very briefly, the Wrigley opinion, I believe we progressed that in detail at pages 12 to 15 of our reply brief. But in short, unlike the situation here, Wrigley was already known to use a menthol with a cooling agent, and that was a good thing. The question was which cooling agent. And the prior arc said that the menthol being used in the Wrigley patent was one of the most suitable, that's a quote, and that WS23 was a particularly preferred. So there was a clear direction in the prior arc to use that combination. Here, given the background of cobalt capping and problems with PBD, that does not exist in Grab, which, as I say, does not contain any suggestion to solve this problem or use the claim structure of the 519 patent. Mr. Moore, your brief argues at some length about how the problem with cobalt capping was well known, but that your client figured out how to do it. So this was a real invention. And you repeat, they figured out how to do it. But I couldn't find anything in the patent that explains how to do it. It seems to me they just did it. And the reason why this resonates with me a bit is because we're talking about whether this Grab reference is a proper 102 reference, because all it does is just list the ingredient. It lists PBC as a coating. It lists ruthenium as a possible addition to the binder. But your client's invention, they figured out how to do it. But it seems to me all they did was just do it. They just claimed it. What am I missing? Well, Your Honor, I don't think that, I think that may be a little too simplistic. I think the patent, the 519 patent, does have detail about how to do it. There are examples about how to form the substrate. And then in particular, on column 9, lines 15 to 25 or 30, about how to treat the substrate. And so there is a very specific way of doing it that they found worked. But that has to do with treatment and preparation and all of that. But none of that is in the claim. Well, first, two points on that. May I continue, Your Honor? I think I'm running out of time. You can answer the question. Thank you. The first point on that is that there is an enabling disclosure about how to do that. And I believe that would entitle the applicant here to broad claims that cover the way to solve the problem, because there is an enabling disclosure. So yes, even as to Claim 1, for example, which does not have those limitations, that is the case. However, there are also, that is the case that it should be still a valid claim, because there is an enabling disclosure. And I wouldn't disagree with you. But the point is, the point I'm trying to make is that if you're just claiming PVD coating on a material that has ruthenium, and you've got a reference that lists PVD as one possible coating, and it lists ruthenium as a possible binder. And it is sufficient to support a 102 rejection. And the argument about, well, yeah, but we figured out how to do it. All of that, whatever how to do it means, is not in the claim, and therefore, isn't an issue in the 102, correct? Well, I would respectfully disagree, because there is an enabling disclosure about how to do it, and that's in the specification. So we think we would be entitled to the broader claims, such as the independence that recite the tool with those properties and that structure. But in addition to that, there are also claims, and some of these were added in the reexamination, that are directed at the specific blasting processes that were recited in the specification. There are also some original claims directed at those treatment processes as well, such as 24, 56, 57, as well as 90 and 93, among probably others. So there's both. There's the broad claims and the specific claims. That's helpful. Thank you, Your Honor. Thank you. We thank both parties and the case is submitted. That concludes our proceedings for this morning.